UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CRIMINAL ACTION NO. 4:17CR-00012-JHM

UNITED STATES OF AMERICA                                                                        PLAINTIFF

V.

RICHARD G. MAIKE, et al.                                                                        DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on a motion by Defendant, Richard G. Maike, to suppress and for a hearing pursuant to *Franks v. Delaware* and *Leon v. United States* [DN 272] and a motion by Defendant, Richard G. Maike, for leave to file a motion to suppress exceeding 25 pages [DN 273]. The United States responded [DN 302, DN 304]. Maike filed a reply. [DN 324]. Defendants, Jason Syn, Faraday Hosseinipour, and Richard J. Anzalone, filed motions to adopt and join Maike's motions and reply. [DN 275, DN 277, DN 278, DN 279, DN 281, DN 331, DN 332, DN 335]. Fully briefed, this matter is ripe for decision.

**I. BACKGROUND**

On November 13, 2019, the grand jury returned a Second Superseding Indictment against Richard Maike, Doyce Barnes, Richard Anzalone, Faraday Hosseinipour, Dennis Dvorin, and Jason Syn. The Second Superseding Indictment alleges that between February 6, 2013, and continuing to December 31, 2014, Maike, Barnes, Anzalone, Hosseinipour, Dvorin, and Syn engaged in a $25 million-dollar "pyramid" scheme, operating under the name Infinity 2 Global or I2G, by representing that investors would receive a return on investment based upon an on-line internet gaming site called i2gcasino.com. The Second Superseding Indictment further alleges that Defendants falsely represented that I2G was generating massive profits from its on-line

internet gambling site and that the public could share in the profits through the purchase of a $5,000 "Emperor" position at I2G. The Second Superseding Indictment asserts that these claims were false and that I2G was operating as a fraudulent pyramid scheme in which inflated returns were paid to early promoters to induce later victim-investors to invest in the company. [Second Superseding Indictment [DN 230] at ¶¶ 1–2]. The Second Superseding Indictment charges Defendants with conspiracy to commit mail fraud under 18 U.S.C. §§ 1341 and 1349 and securities fraud under 15 U.S.C. § 78j(b) and 18 U.S.C. § 371. Richard Maike is also charged with nine counts of money laundering under 18 U.S.C. § 1957 and two counts of tax evasion under 26 U.S.C. § 7201. [DN 230 at ¶¶ 23–40].

As part of the United States' investigation into this case, the Federal Bureau of Investigation ("FBI") obtained a search warrant issued by United States Magistrate Judge H. Brent Brennenstuhl to search two locations on January 14, 2015—Maike's residence and his accountant's office. FBI Special Agent David McClelland submitted an affidavit in support of the Application for a Search Warrant. Maike now files a motion to suppress and for a hearing pursuant to *Franks v. Delaware* and *Leon v. United States* and a motion for leave to file a motion to suppress exceeding 25 pages.

Defendants Syn, Hosseinipour, and Anzalone moved to adopt and join the motions to suppress and to exceed page limitations and Maike's reply [DN 275, DN 277, DN 278, DN 279, DN 281, DN 331, DN 332, DN 335]. The Court grants these Defendants' motions to adopt and join and grants Maike's motion for leave to exceed the page limitations.

## II. LAW

The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. CONST. amend. IV. "When probable cause is required,

it is an obvious assumption that there will be a truthful showing of probable cause." *United States v. Witherspoon*, No. 1:09-CR-00041-TBR, 2010 WL 724663, *2 (W.D. Ky. Feb. 25, 2010) (citing *Franks v. Delaware*, 438 U.S. 154 (1978)). In challenging the veracity of statements contained in the affidavit, the defendant must prove by a preponderance of the evidence that "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Franks*, 438 U.S. at 155–56. "If this is established by the defendant, then the false material must be set aside in determining whether the remaining content is sufficient to establish probable cause." *Witherspoon*, 2010 WL 724663, *2 (citing *Franks*, 438 U.S. at 156). In the case where the remaining material fails to establish probable cause, "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks*, 438 U.S. at 156.

To be entitled to a *Franks* hearing, a defendant must (1) "make[ ] a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and (2) "the allegedly false statement is necessary to the finding of probable cause." *United States v. Graham*, 275 F.3d 490, 505 (6th Cir. 2001) (citation and internal quotation marks omitted). The Sixth Circuit's "well-settled framework for *Franks* hearings requires a defendant to 'point to *specific* false statements' and then 'accompany his allegations with an offer of proof.'" *United States v. Green*, 572 F. App'x 438, 442 (6th Cir. 2014) (quoting *United States v. Cummins*, 912 F.2d 98, 101, 103 (6th Cir. 1990)). Further, while alleged omissions on the part of the affiant are not excluded from consideration under *Franks*, "to be constitutionally problematic, the material must have been deliberately or recklessly omitted and must have undermined the showing of probable cause." *United States v. Carpenter*, 360 F.3d 591, 596–97 (6th Cir. 2004). This does not mean, however, that officers must

divulge every piece of exculpatory evidence in the affidavit. *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998) ("To interweave the *Brady* due process rationale into warrant application proceedings and to require that all potentially exculpatory evidence be included in an affidavit, places an extraordinary burden on law enforcement officers, compelling them to follow up and include in a warrant affidavit every hunch and detail of an investigation in the futile attempt to prove the negative proposition that no potentially exculpatory evidence had been excluded.").

### III. DISCUSSION

Maike argues a *Franks* hearing is warranted because the search warrant affidavit presented to Magistrate Judge Brennenstuhl contained both materially false and misleading statements and deliberately or recklessly made omissions and, as such, rendered the warrant lacking in probable cause. Specifically, Maike contends that Agent McClelland: (1) falsely stated that Maike was marketing an investment opportunity; (2) intentionally omitted any mention or explanation that I2G was a Multi-Level Marketing ("MLM") company; (3) correctly explained that Emperors were told they would secure a share of 50% of the casino profits without having to sell any memberships to I2G and that the Emperor level was limited to a total of 5,000 people; (4) omitted the material exculpatory fact that Maike and I2G spent over $440,000 purchasing and developing its flagship product—the Touch software program, I2G Touch; (5) falsely stated that Maike initially purchased a computer application program which he relabeled I2G Touch for $35,000 from a company called Qubeey; (6) made a misleading statement that the basic version of the I2G Touch software was offered to the public for free through Qubeey's website; (7) correctly stated that the I2G Touch was a "white-label" product, produced by one company and marketed by others, which gave the wrong impression; (8) failed to inform the Magistrate Judge that the I2G Touch was I2G's flagship product, actively marketed and promoted by Maike throughout I2G and G1E's existence; (9) failed

4

to disclose that I2G had paid approximately $522,000 refunds to "Independent Business Owners ('IBO') Product Package" purchasers who made refund requests and failed to disclose that the Refund and Exchange Policy was prominently displayed in a red-bordered box on the Terms of Agreement; (10) misled the Magistrate Judge by mentioning only two IBOs who were refused a refund; (11) failed to disclose that Maike "fully disclosed" unanticipated problems facing the company in his live and/or remote IBO audiences; (12) falsely stated that Maike led potential investors to believe that I2G had a very large number of international members who would be using and promoting the casino; (13) stated that I2G stopped marketing the I2G Casino and abruptly changed its name to G1E which Maike announced on a July 30, 2014, conference call without disclosing that Maike fully explained what he was doing and the reason why; (14) misleadingly stated that Maike shut down the I2G and I2Gcasino web pages, leaving no forwarding link from either of these pages to the new company web pages; (15) falsely stated that I2G was not selling a product; (16) falsely stated that Maike claimed that I2G was in the process of purchasing a $500 million land-based casino; (17) falsely classified the $3 million dollars utilized by Maike to purchase land in Kansas as "investor funds;" (18) falsely classified the payments made by IBOS as "investor deposits;" (19) falsely suggested that the "funds" were primarily used for lavish personal expenses; (20) failed to reveal the key role of a disgruntled former IBO Chuck King; and (21) failed to reveal the connection of the Kentucky Attorney General's Office complaints and Chuck King.

For the following reasons, the Court concludes that Maike failed to produce a substantial preliminary showing that Agent McClelland made a false statement in the affidavit or deliberately or recklessly omitted information regarding Maike or I2G from the affidavit.

### A. Investment Statements

As discussed above, the Sixth Circuit's "well-settled framework for *Franks* hearings requires a defendant to point to *specific* false statements and then accompany his allegations with an offer of proof." *Green*, 572 F. App'x at 442 (citation and quotation marks omitted) (emphasis in original). In his original motion, Maike submits two "offers of proof" to support his motion for a *Franks* hearing: (1) a citation to the I2G Terms of Agreement which provides that I2G's business "does not constitute the sale of any franchise, security, nor the making of any investment" and (2) a transcript of Agent McClelland's testimony at the probable cause hearing in which he agreed that I2G representatives did not use the word "investment" because, in his opinion, "they want[ed] to avoid the scrutiny of the Securities and Exchange Commission," but that he nonetheless believed "that it absolutely was an investment." [DN 272 at 10]. Maike argues that the I2G Terms of Agreement stated that the purchase of an IBO position did not constitute the sale of a security or the marketing of an investment. Despite this language, Maike contends that Agent McClelland deliberately, repeatedly, and falsely stated and implied that Maike was explicitly promoting, marketing, and designating I2G as an investment opportunity to "investors" and that Maike was holding "investment funds." [DN 272 at 10; DN 324 at 4]. Maike contends Agent McClelland specifically omitted from the warrant that Maike held I2G out as a multi-level marketing company and never promoted I2G as an investment opportunity at all. [DN 324 at 4]. According to Maike, Agent McClelland should have "truthfully informed the magistrate that I2G was an MLM company and that Mr. Maike was *not* promoting I2G as an investment company." [*Id*.].

In response, the United States provides an August 10, 2013, I2G conference call in which Maike states: "I can't gamble here in Kentucky, but I can own stock in the Sands Corporation . . . or in Caesars Entertainment. I can own stock in those, and I can get paid dividends based on the

profit of those casinos, and that's exactly what we are doing. We're not making you a stockholder, but we are paying you dividends . . . ." [DN 305, Conference Call at 25:50–26:19]. Additionally, the United States points to the I2G's Infinite Opportunity Commission Plan that provides that if an individual spends $5,000 on an "Emperor Package," he or she will "share in 50% of specified profits immediately, without a sponsorship requirement needed." [DN 302, Exhibit B at 3, 8]. The United States argues that these exhibits support Agent McClelland's characterization of Maike's conduct as promoting an investment. The Court agrees. Agent McClelland's description of I2G's activities as promoting or marketing investments, his characterization of I2G's IBOs as investors, and his representations that Maike induced individuals to join I2G by making false or fraudulent representations and promises were neither false nor reckless but rather a reasonable interpretation of the conference calls. Likewise, Agent McClelland's exclusion from the affidavit that I2G was a MLM is supported by a reasonable interpretation of the conference calls. Additionally, in as much as Maike argues that I2G was not marketing an investment or selling securities, those are questions of fact for a jury to decide at the trial of this matter.

### B. Agent McClelland's Allegedly Admitted Omissions

Maike complains extensively regarding alleged omissions by Agent McClelland. Maike contends that Agent McClelland admitted that he deliberately omitted some facts that pertained to the Maike investigation and deliberately included only the facts that he believed were necessary to establish probable cause. [DN 272 at 3–4; DN 324 at 2–3]. Specifically, in the introductory section of the search warrant affidavit, Agent McClelland stated: "Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts I believe are necessary to establish probable cause." [DN 272-1 at ¶ 4]. Maike maintains that this statement

7

confirms that Agent McClelland intentionally omitted critical information from the affidavit.

The Sixth Circuit has "repeatedly held that there is a higher bar for obtaining a *Franks* hearing on the basis of an allegedly material omission as opposed to an allegedly false affirmative statement." *United States v. Fowler*, 535 F.3d 408, 415–16 (6th Cir. 2008). "This higher standard is due to the 'potential for endless rounds of *Franks* hearings' due to potentially 'endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit.'" *United States v. Abbott*, No. 5:19-CR-31-TBR, 2019 WL 5865933, at *1 (W.D. Ky. Nov. 8, 2019) (quoting *Fowler*, 535 F.3d at 416). Thus, "*Franks* is generally 'inapplicable to the *omission* of disputed facts, except in the *very* rare case where the defendant makes a strong preliminary showing that the affiant *with an intention to mislead* excluded critical information from the affidavit.'" *Abbott*, 2019 WL 5865933, *1 (quoting *United States v. Shaffer*, 238 F. Supp. 3d 913, 918 (E.D. Ky. 2017)). Here, as noted by the United States, the inclusion of the above-cited language is a customary practice and does not suggest a nefarious purpose or an intent to mislead. Accordingly, having considered Agent McClelland's introductory statement in light of Maike's other arguments related to alleged omissions, the Court concludes that Maike failed to make a strong preliminary showing that Agent McClelland excluded critical information from the affidavit intending to mislead or deceive.

### C. Cost of I2G Touch

Maike complains that Agent McClelland failed to disclose the fact that Maike and I2G spent over $440,000 purchasing and developing its flagship product, the I2G Touch. Maike also asserts that Agent McClelland compounded the omission of product purchase and development costs by stating in ¶ 8 of the affidavit that "Maike initially purchased a computer application program which he relabeled I2G Touch on or about June, 2013 for $35,000 from a company called

Qubeey." [DN 272 at 12-13; DN 324 at 8]. In his reply, Maike tendered additional documents to support his argument that Agent McClelland falsely stated that Maike had only spent $35,000 on the I2G Touch. The documents tendered by Maike include a list of possible payments made to Rocky Wright, creator of Qubeey and Songstergram, between June 2013 and July 2014; a Modification of Qubeey Intellectual Property Agreement dated September 24, 2013; a common stock agreement between Qubeey and Velocity International Marketing; an email from Rocky Wright to Agent McClelland dated December 5, 2014, regarding the first time Wright emailed Maike about the agreement; a stock transfer agreement from Songstergram to Maike; a stock purchase contract between Infinity 2 Global HK Limited and Rocky Wright regarding Songstergram; a stock purchase contract between Maqui Singapore Private Limited and Rocky Wright regarding Songstergram; and emails between Wright and Maike dated February 19, 2014, and May 6, 2014. [DN 324-8]. [*See also* DN 324-11; DN 324-12; DN 324-13].

These documents neither support Maike's allegations nor contradict Agent McClelland's affidavit. Even if all the payments listed on the first page of Exhibit 8 occurred, there is no indication in those documents that they were for the *initial* computer application program purchased in June of 2013 that Agent McClelland referenced in his affidavit. Reviewing the numerous stock agreements tendered by Maike, much of the money invested appears to be for interest in Qubeey and Songstergram and not the actual I2G Touch.

**D. International Members**

Maike maintains that the most troubling and deliberately misleading statements contained in the affidavit are found in ¶ 11 and are related to Agent McLelland's assertion that Maike "falsely led potential investors to believe that I2G had a very large number of international members who would be using and promoting the casino." [DN 272-1 at ¶ 11]. Maike argues that Agent

9

McClelland crafted the whole paragraph to persuade the Magistrate Judge that Maike was supposedly falsely telling IBOs about existing international members who would be using and promoting the casino and causing enormous casino profits. The Court disagrees. A review of Maike's conference call from August 3, 2013, reveals that Agent McClelland gave an accurate summary of Maike's and Barnes' claims in the conference call. [DN 305, 8/3/2013 Conference Call].

### E. Land-Based Casino

Maike contends that Agent McClelland falsely stated in ¶ 14 of the affidavit that I2G was in the process of purchasing a $500 million land-based casino. [DN 272 at 19–20; DN 324 at 8]. In his affidavit, Agent McClelland specifically stated that this information came from a conference call with I2G members on or about February 4, 2014. While Maike claims this statement is false, Maike failed to provide the February 4, 2014, transcript in his reply as he did with other conference calls. [DN 324-1–7]. Accepting Maike's representation regarding what he said about the land-based casino in the February 4, 2014, conference call, the Court cannot discern a significant difference between the statement that I2G was in the process of purchasing a land-based casino and that I2G was "in the process of working on a project to purchase our own hotel casino facility." [DN 272 at 20].

### F. Earnings

Maike complains that Agent McClelland falsely implied in ¶ 15 of his affidavit that in the first few months of the program, three people had made over $200,000 each in the I2G Casino. [DN 272 at 26; DN 324 at 8]. Contrary to Maike's argument, Agent McClelland never linked the $200,000 earned by three individuals with casino profits. He specifically stated: "Maike also stated that in the first few months of the program, three people had made over $200,000, thereby

10

enticing people to invest and further promote I2G." [DN 272-2 at ¶ 15]. Additionally, it appears to the Court that this information came from the February 4, 2014, conference call, which was not provided to the Court by Maike in his reply.

### G. Chuck King

In ¶ 29 of the affidavit, Agent McClelland stated that "[t]he Kentucky Attorney General's Office has recently received several complaints from I2G investors claiming that they have been defrauded and requesting an investigation into the company." [DN 272-1 at ¶ 29]. Maike argues that Agent McClelland failed to inform the Magistrate Judge that all of the Kentucky complaints were coordinated by Chuck King, a long-time antagonist of Maike against whom Maike obtained a Temporary Restraining Order the day before the search warrant affidavit was submitted. [DN 272 at 22–23; DN 324-9].

Evidence that the complaints received by the Kentucky Attorney General's Office from I2G investors were potentially generated by those investors from a template provided by a "disgruntled former IBO" does not contradict or misrepresent the fact that the Kentucky Attorney General's Office received several complaints regarding I2G.

### H. Remaining Arguments

The remaining arguments by Maike rely on conclusory statements and arguments which are not enough to overcome a "presumption of validity with respect to the affidavit supporting the search warrant." *Franks*, 438 U.S. at 171. Maike undertakes almost a paragraph-by-paragraph technical review of the affidavit to find fault with various characterizations of the evidence and data made by Agent McClelland or to state that he disagrees with some of the information in the affidavit. In many cases, Maike is just arguing that a different interpretation should be placed on his conduct than Agent McClelland's interpretation "without providing any basis for the court to

11

find that the agent intentionally or with reckless disregard misstated Defendant's conduct." *United States v. Bates*, No. 1:13-CR-00501, 2017 WL 9439178, at *6 (N.D. Ga. June 1, 2017), report and recommendation adopted, No. 1:13-CR-501-ELR-JFK, 2017 WL 3158762 (N.D. Ga. July 24, 2017); *see also United States v. Symmank*, 397 F. App'x 991, 994 (5th Cir. 2010) (finding that disparate interpretations of evidence do not equate to a "deliberate falsehood or a reckless disregard for the truth"); *United States v. Gotti*, 42 F. Supp. 2d 252, 280–81 (S.D.N.Y. 1999); *United States v. Jimenez*, 824 F. Supp. 351, 361 (S.D.N.Y. 1993) ("A defendant's submission of his own counter-interpretation of acts, however, does not satisfy the showing required for a *Franks* hearing.").

It also appears to the Court that Maike seeks to use a *Franks* hearing to dispute some, if not all, of charges against him; however, a *Franks* hearing is the improper forum. *Mays*, 134 F.3d at 816 ("[T]he probable cause determination in *Franks*, derived from the Fourth Amendment, involves no definitive adjudication of innocence or guilt . . . ."). Additionally, in as much as Maike argues that expert testimony refutes some of Agent McClelland's statements in the affidavit, this testimony does not render the affidavit insufficient to establish probable cause. Instead, the existence of probable cause is not determined in light of expert testimony obtained after the execution of the search warrant.

Finally, the Court reviewed the additional "offers of proof" tendered by Maike in his reply which the Court did not address above. [DN 324]. Some of the additional "offers of proof" submitted by Maike are actually consistent with the information provided by Agent McClelland in his search warrant affidavit. Others do not reflect an omission of information from the affidavit with an intention to mislead or deceive.

For these reasons, the Court finds that Maike fails to offer sufficient evidence showing that Agent McClelland knowingly, intentionally, or with reckless disregard to the truth, included

falsehoods or material omissions in his affidavit. *See United States v. Bateman*, 945 F.3d 997, 1010 (6th Cir. 2019).

As a side note, the Court agrees with the United States that Anzalone, Syn, and Hosseinipour have not established standing to challenge the search of the properties in question. These Defendants did not live at the residence or work at the office in question. They have not alleged any privacy interest in any of the evidence seized, and therefore, they have no standing to move to suppress evidence seized from either of the two locations.

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the motions by Defendants, Jason Syn, Faraday Hosseinipour, and Richard J. Anzalone, [DN 275, DN 277, DN 278, DN 279, DN 281, DN 331, DN 332, DN 335] to adopt and join the motions or reply by Defendant, Richard G. Maike, are **GRANTED.**

**IT IS FURTHER ORDERED** that the motion by Defendant, Richard G. Maike, for leave to file a motion to suppress exceeding 25 pages [DN 273] is **GRANTED**.

**IT IS FURTHER ORDERED** that the motion by Defendant, Richard G. Maike, to suppress and for a hearing pursuant to *Franks v. Delaware* and *Leon v. United States* [DN 272] is **DENIED**.

Joseph H. McKinley Jr., Senior Judge
United States District Court

April 23, 2020

cc: counsel of record